Davor Rukavina, Esq.
Texas Bar No. 24030781
Thomas D. Berghman, Esq.
Texas Bar No. 24082683
Munsch Hardt Kopf & Harr, P.C.
500 N. Akard St., Ste. 3800
Dallas, Texas 75201
drukavina@munsch.com
tberghman@munsch.com

*Proposed Counsel to the Debtor*
*and Debtor-in-Possession*

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE NORTHERN DISTRICT OF TEXAS**
**DALLAS DIVISION**

| | |
|---|---|
| In re: | § <br> § Case No. 21-31488-sgj11 <br> § <br> WATTSTOCK, LLC, § Chapter 11 <br> § Subchapter V <br> § <br> Debtor. § <br> § |

**DECLARATION OF ANDREW F. HERR**
**IN SUPPORT OF FIRST DAY MATTERS**

I, Andrew F. Herr, do hereby declare as follows:

1. My name is Andrew Herr. I am over the age of eighteen years, I have never been convicted of a felony or crime of moral turpitude, and I am otherwise qualified to make this declaration. The factual matters set forth herein are within my personal knowledge and are true and correct.

2. I am the acting Chief Executive Officer ("CEO") of WattStock, LLC ("WattStock" or the "Debtor"), a company organized under the laws of Texas and the debtor and debtor-in-possession in the above-captioned Bankruptcy Case. I have served as acting CEO since January 1, 2019. In my role as CEO, I am familiar with

the Debtor's operations, including its financial affairs, products and services offered, and books and records.

3. I have a master's degree in economics from Columbia University and have worked in the energy industry extensively throughout my career. The bulk of my career has been as a management consultant working for global consultancies such as Arthur D. Little, Ernst & Young, Accenture, and AT Kearney. My clients have included major electric and gas utilities in the US and abroad.

4. I submit this Declaration to assist the Court and parties in interest in understanding the circumstances that compelled the filing of the Debtor's chapter 11 bankruptcy case (the "Bankruptcy Case") and to support the Debtor's request for relief on the motions and requests for relief contemporaneously filed with this Declaration.

5. Except as otherwise indicated, the statements in this Declaration are based upon my personal knowledge, discussions with the Debtor's management, directors, and advisors, review of the Debtor's documents and information, and/or opinions based on my experience and knowledge in the food service industry.

### I.    The Debtor and Its Operations

6. WattStock was organized in 2013 for the purpose of developing an electric transformer leasing business, which has not yet succeeded. In 2018, a new opportunity arose, and WattStock developed a second business line refurbishing used GE aero-derivative gas turbine power plants. In a typical transaction, the Debtor contracts with power plant developers and investors to purchase used power plants

and refurbish the same. In the refurbishing process, the Debtor works closely with General Electric ("GE"); the power plant engines are generally refurbished by GE at GE's engine shop while the remainder of the power plant is shipped to the Debtor's facilities in Houston, Texas for remanufacturing. The Debtor's business is a global one – together with its clients and GE, the Debtor purchases and/or works on power plants located in Abu Dubai, South America, Spain, Turkey, among other countries. Revenue during 2019 and 2020 totaled $17,179,530.73 and $4,149,065.85 (lower due to pandemic-related work stoppages), respectively.

7.  On the management side of its business, the Debtor regularly oversees and employs subcontractors to perform services necessary to the completion of projects. The roles and services performed by the Debtor's subcontractors ranges from dismantling power plants to air and sea shipping to testing and repairing generators. For example, as described further below, at the time of bankruptcy filing, the Debtor is overdue on an obligation to one subcontractor performing work in Abu Dubai in connection with an active project, and additional obligations (funded by GE) will arise in the next weeks. In order to preserve the value of the same, the Debtor seeks approval for the payment to its critical vendor.

8.  On the refurbishment side of the business, the Debtor may act either as a general manager of a purchase-to-delivery of a power plant or as a subcontractor to GE where GE has end-to-end project management responsibilities and WattStock is responsible for managing the refurbishment of the balance of the plant. At the time of filing, the Debtor has no refurbishment active in its shop; rather, the Debtor is

subcontracting to GE and managing three subcontractors performing physical work in Abu Dubai. The Debtor has a lease with GE Real Estate for the premises in Houston, Texas where it performs its services; however, rent for the same has been deferred, and as the Debtor transitions into this bankruptcy case and assesses its options, the Debtor and GE have already engaged in discussions regarding a consensual and cooperative resolution of any lease issues.

9.  The Debtor currently employs five (5) persons: four (4) W-2 employees and one (1) on a contract basis (the Debtor's controller, who works as a vendor). The Debtor pays its employees semi-monthly in arrears. Due to the circumstances leading to the filing of the bankruptcy case, on a go-forward basis the Debtor has resolved to (a) continue paying one (1) employee at his current rate; (b) eliminate the sales-draw for two (2) sales employees but continue to pay sales compensation in the event of any closed sales; (c) adjust compensation for the contract Controller from an agreed-to monthly fee to hourly; and (d) I will voluntarily forego salary until and if the Company emerges from Chapter 11.

10. Like many businesses, the COVID-19 pandemic caused serious disruptions to the Debtor's business. For example, the Debtor sold a project in January 2020, and was unable to commence work on same due to an inability to travel. Subsequent, and as a result of the pandemic, the order was reduced in size from three (3) units to one (1) unit.

11. Separately, the Debtor recently received an adverse ruling and became subject to a *Temporary Restraining Order* ("TRO") in the 127th Judicial District Court

for Harris County, Texas (the "State Court") related to a dispute over an employment agreement. The TRO froze the Debtor's "liquidated or unliquidated assets" in the Court's jurisdiction, ostensibly preventing the Debtor from operating its business. The state court's disproportionate order (the underlying amount in dispute is at most $161,667, and the employee in question otherwise has received substantial compensation – it is the Debtor's position that nothing is owed at all) combined with the COVID-19 pandemic's effect on the Debtor's business left the Debtor no choice but to seek bankruptcy protection.

12. Accordingly, I believe that the Debtor's request for protection pursuant to title 11 of the United States Code (the "Bankruptcy Code"), and specifically subchapter V of chapter 11 of the Bankruptcy Code, is the best and likely only means to navigate WattStock, in its reorganized form, through these trying times to the mutual benefit of WattStock's stakeholders and customers.

## II.    The Debtor's Obligations

13. The Debtor does not carry traditional secured debt obligations. The Debtor was capitalized through equity investment and unsecured notes, and paid its bills in the ordinary course of business through a combination of business cash flow and above-described capital raises.

14. Like many other companies, the Debtor applied for government loans in the last eighteen (18) months, including the Paycheck Protection Program ("PPP") and the SBA Disaster Loan program. With respect to the PPP loan, the Debtor has proceeded with its application for forgiveness of the same, of all but some $8,614.41.

The terms of the standardized SBA disaster note are $731.00 monthly payments for thirty (30) years at 3.75% interest on the $150,000 principal. The Debtor's other debts consist of ordinary trade debt. Certain equipment used in the Debtor's business is purchase money financed or lease-to-own.

### III. The First-Day Motions

15. Concurrently with the filing of the Bankruptcy Case, the Debtor has filed three (3) first-day motions (the "First-Day Motions") requesting certain relief on an expedited basis. The First-Day Motions serve the purpose of protecting and preserving the Debtor's estate, including by ensuring timely payment of employees and critical vendors. I believe that the relief requested in each of the First-Day Motions is appropriate and tailored to protect and preserve the estate by ensuring an orderly transition for operating the Debtor's business in Chapter 11.

**A. Debtor's Emergency Motion for Authority to Use Cash Collateral and make Adequate Protection Payments (the "Cash Collateral Motion")**

16. Traditionally, the Debtor had no secured lender – operations were financed through cash flow and equity. During the pandemic, the Debtor qualified for and obtained a $150,000 disaster loan (the "SBA Loan") offered by the Small Business Administration (the "SBA"). The SBA Loan is secured by a lien on all assets. A UCC-1 Financing Statement was filed with the Texas Secretary of State. However, the SBA's security interest in the Debtor's cash is not perfected, and the Debtor believes the lien to be avoidable. Additionally, some portion of the Debtor's cash on hand was deposited by GE for purposes of paying subcontractors working on GE-Debtor projects. It is the Debtor's position that these funds are not Cash Collateral.

17. Nevertheless, out of an abundance of caution, the Debtor files the Cash Collateral Motion for a few simple reasons. First, the SBA Loan of $150,000 is many times over-secured. The applicable collateral (the Debtor's assets) are valued around $2 million consisting of tools, jacks, lifts, trucks, other industrial equipment, as well as power plant parts. Therefore, there is a sufficient equity cushion in the collateral to adequately protect the SBA. Second, because debt service is only $731 per month (for thirty (30) years at 3.75%), the Debtor will continue to make debt service payments, again adequately protecting the SBA. The Debtor is not in default on the SBA Loan. Third, the Debtor anticipates incoming revenue of $500,000 to $2,500,000 in the next months; therefore, the Debtor will be able to maintain a positive net cash flow and remain administratively solvent. In the highly unlikely event of default, the SBA will be protected.

18. The Debtor does not anticipate having significant spend during the first months of the Bankruptcy Case (including for the reasons stated below in connection with the Employee Wages Motion). Proposed cash collateral usage is therefore limited to paying employee wages, an administrative reserve for the Subchapter V Trustee's fees/costs, a post-petition retainer to Debtor's proposed counsel, Munsch Hardt Kopf & Harr, P.C., and to pay debt service to the SBA. These items will permit the Debtor to transition into Chapter 11 while having administrative creditors addressed, and permitting the Debtor to work with its stakeholders (mainly GE) to formulate an exit strategy.

**B. Debtor's Emergency Motion for Entry of Order Authorizing Payment of Prepetition Employee Wages (the "<u>Employee Wage Motion</u>")**

19. The Debtor pays its employees twice per month, in arrears. However, due to the *TRO*, the Debtor has been precluded from paying its employees during the month of August. Accordingly, as of the Petition Date, the Debtor is obligated to one of its employees for the period from August 1, 2021 through the Petition Date (August 17, 2021). The Debtor thus seeks the Court's approval to pay accrued unpaid pre-petition wages owed to project manager Donald J. Brunswick in an amount of $4,314.35.

20. For the avoidance of doubt, although my salary is $120,000 per annum, due to the Debtor's financial struggles I have received only $30,000 of my salary over the past 18 months, and plan on reducing my salary to $0.00 for at least the near term. The Chairman, Patrick Jenevein, has never drawn a paycheck from the company. Other employees are sales staff, where their salaries are a draw against closed deals.

21. It is essential that the Debtor immediately establishes the standard of treatment for fulfilling payment obligations to its employees. Any delay in paying these obligations will adversely affect the Debtor's relationship with the employees and could irreparably impair morale. At this critical early stage, the Debtor cannot risk the substantial disruption to its business operations that will result if payment is not permitted. Moreover, the Debtor is a relatively small business, and it relies heavily on the particularized skills of its employees. The risk of losing such valued and qualified persons would cripple any reorganization effort.

### C. Debtor's Emergency Motion for Entry of Interim and Final Orders Authorizing Debtor to Pay Critical Vendor (the "Critical Vendor Motion")

22. The Debtor requests authority to pay one critical vendor set forth in the Critical Vendor Motion. It is critical for the Debtor to continue their business relationships with the Critical Vendor, uninterrupted to the greatest extent possible. The Critical Vendor in question is Thomassen Service Middle East LLC ("TSME"). TSME is a subcontractor providing vital services in connection with a management project in Abu Dubai with a potential value to the Debtor of $1.6 million. A failure to make the payment would jeopardize the Debtor's potential revenue from the project and would likely have collateral effects on the Debtor's reputation and ability to work with similar subcontractors.

23. On or about July 27, 2021, the Debtor initiated a $50,000.25 wire transfer to TMSE as needed; however, due to an incorrect account number supplied by TMSE, the wire transfer failed and the money was recently returned to the Debtor's account. Accordingly, the Debtor desires to re-initiate the wire transfer as soon as possible. Finally, the funds in question were provided to the Debtor pursuant to a broader project agreement with GE – accordingly, the funds are arguable held in trust by the Debtor and are not estate property. Nevertheless, out of an abundance of caution, the Debtor seeks the Court's approval to make the payment to TMSE pursuant to the Critical Vendor Motion.

### IV. Emergency Consideration

24. As discussed above, the Debtor's financial situation has been jeopardized due to the TRO and market conditions beyond the Debtor's control,

including the ongoing COVID-19 pandemic and ramifications related thereto. The Debtor, therefore, initiated the Bankruptcy Case to reorganize its financial affairs and obtain a fresh start. But the Debtor's situation is precarious, and any further shocks to its system could be detrimental or fatal. I thus believe that emergency consideration of the First-Day Motions is necessary to avoid immediate and irreparable harm to the business, its stakeholders, employees, vendors, and customers.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

Executed on August 23, 2021.

*/s/ Andrew Herr*
Andrew F. Herr
Acting Chief Executive Officer